United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 26, 2007**

Charles R. Fulbruge III
Clerk

REVISED FEBRUARY 15, 2007

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————

No. 06-30041

———————

DEXTEL TERREBONNE,

Plaintiff-Appellant,

versus

K-SEA TRANSPORTATION CORP.,

Defendant-Appellee.

———————

Appeal from the United States District Court
for the Eastern District of Louisiana

———————

Before GARWOOD, DENNIS, and OWEN, Circuit Judges.

GARWOOD, Circuit Judge:

Plaintiff–appellant Dextel Terrebonne (Terrebonne) appeals the district court's September 13, 2002, November 5, 2002, and December 15, 2005 orders granting the motion of defendant–appellee K-Sea Transportation Corporation (K-Sea) to compel arbitration, denying Terrebonne's motion for rehearing of that order, and granting K-Sea's motion to confirm the June 27, 2005 arbitration award and denying Terrebonne's motion to set aside the September 2002 order

to compel.    For the following reasons, we affirm.

**FACTS AND PROCEEDINGS BELOW**

In November 2000, Terrebonne worked for K-Sea as a crew member aboard its tug MARYLAND.   On November 3, while the tug was in Bridgeport, Connecticut, Terrebonne overexerted himself when lifting a pump in the tug's port propeller shaft alleyway. Terrebonne reported the incident on November 28, 2000, complaining of abdominal pain.   He was diagnosed with a left inguinal hernia, and underwent hernia repair surgery on December 11, 2000, returning to work on January 26, 2001.

On March 12, 2001, Terrebonne and K-Sea executed in New York a written "Partial Release and Claims Arbitration Agreement." Pursuant to that agreement, the parties partially settled Terrebonne's claims arising out of the November 3, 2000 incident for $2,362.56.   Specifically, the agreement settled "all rights, claims, liens, remedies or causes of action for any damages that he [Terrebonne] has incurred from 11/03/00 to March 12, 2001." Terrebonne reserved the right to seek recovery for "damages that may develop after the date of this agreement that are related to the alleged incident on the Tug MARYLAND on or about 11/3/02," but agreed to arbitrate any such future claims in New York:

> "In further consideration of this partial settlement, Dextel Terrebonne agrees to submit any claims related to the alleged incident on the Tug MARYLAND on 11/3/00, for damages that develop after the date of this agreement, arising under the theory of unseaworthiness, Jones Act, or any other applicable law to arbitration in New York

2

pursuant to the Commercial Arbitration Rules of the American Arbitration Association (AAA). . . . The decision of the arbitrators shall be final and binding on the parties and any United States District Court shall have the jurisdiction to enforce this agreement, to enter judgement on the award and to grant any remedy provided by law in respect of the arbitration proceedings."

According to K-Sea's uncontradicted affidavits, Terrebonne "reported a recurrence of his prior hernia" on April 26 or 27, 2001 while working on the tug. Terrebonne continued to work until May 25, 2001 "when he complained that his prior hernia had developed again." After May 2001, he underwent medical treatment for the reinjury.

On May 1, 2002, Terrebonne instituted this suit against K-Sea in the court below. His complaint "demands trial by jury," alleges that it is filed "under the Jones Act (46 U.S.C. [§] 688) for negligence, and under the General Admiralty and Maritime Law for unseaworthiness, maintenance, care and wages." It further asserts that plaintiff was "an employee of Defendant serving as a crew member aboard its vessels," and that:

"On or about November 3, 2000 Plaintiff was in the course of employment when he was required to engage in awkward positioning and the lifting of heavy weights excessive for a single person when as a result of said unseaworthy condition and failure to provide a safe place to work he was injured and suffered re-injury on or about April 27, 2001 when he was required to move air plane tires in awkward positions resulting in excessive lifting and overexertion because of said failure to provide a safe place to work and unseaworthy condition."

The complaint next alleges that "Defendant's tortious acts

3

aforesaid caused or contributed to Plaintiff's damages."[1] The complaint makes no reference to the March 12, 2001 settlement agreement or the payment pursuant thereto. No amended complaint has been filed or sought to be filed.

K-Sea moved to "stay further proceedings in this matter pending completion of the arbitration" of Terrebonne's claims pursuant to the March 12, 2001 agreement. Terrebonne opposed the motion, arguing that his April 2001 injury was a separate injury from his prior hernia; that the arbitration agreement was unenforceable under section one of the Federal Arbitration Act (FAA), 9 U.S.C. § 1, because it involves a seaman's employment contract; that the Jones Act, 46 U.S.C. § 688, by virtue of its incorporation of section five of the Federal Employers' Liability Act (FELA), 45 U.S.C. § 55, voided the agreement; and that the agreement is also void under 46 U.S.C. § 183c(a).[2]

Over Terrebonne's objections, the district court granted K-Sea's motion to compel on September 13, 2002 (the order was entered

---

[1]Plaintiff's damages are alleged to include: "a. Pain and suffering, past, future; b. Mortification, humiliation, fright shock and embarrassment; c. Loss of earnings and earning capacity; d. Hospital, pharmaceutical and other cure expenses; e. Aggravation of prior condition, if any there be; f. Inability to engage in social, recreational, and other pursuits previously enjoyed; g. mental anguish; h. Found; i. Maintenance, cure, and wages."

[2]On appeal, Terrebonne does not argue that the agreement is void under 46 U.S.C. § 183c(a), which by its terms applies only to passenger vessels.

4

on September 16, 2002).[3]  The court concluded that Terrebonne's second hernia was a recurrence of the first hernia; that the March 12, 2001 agreement is "clearly separate and independent from Terrebonne's employment contract"; that Terrebonne's FELA-based argument was unsupported by case law and further undermined by the fact that the agreement does not exempt K-Sea from liability; and that 46 U.S.C. § 183c(a) is inapplicable as it only deals with passenger vessels.  On October 11, 2002, Terrebonne filed a "Motion for Rehearing" which the district court denied on November 5, 2002, treating the motion as one under Rule 60(b) and concluding that Terrebonne had not provided any "clarification of issues or new evidence" warranting reconsideration.

Thereafter, Terrebonne, on March 26, 2003, filed suit in Louisiana state court against K-Sea respecting the same matter.  K-Sea responded by moving the district court to enjoin prosecution of the state court suit and to require Terrebonne to abide by the court's orders compelling arbitration.  Before the district court ruled, however, Terrebonne agreed to a consent order which the district court approved, signed and entered May 13, 2003.  That order recites that Terrebonne and his counsel "agree to dismiss the Louisiana state court action," "agree to abide by this court's

---

[3]The order concludes by reciting that "the defendant's motion to compel arbitration and stay litigation is GRANTED" and "this case is closed for statistical purposes;" the order does not direct, and K-Sea's motion did not request, that the suit be dismissed.

5

Order dated September 13, 2002, compelling arbitration of this dispute" and "agree to proceed forthwith with the arbitration before the American Arbitration Association." The consent order also "dismisses, as moot" K-Sea's request for injunction.

Arbitration began in New York in June 2003. Terrebonne and K-Sea made various submissions and attended a two-day evidentiary hearing in October 2004, where there were over 200 exhibits and 450 pages of testimony. Following post-hearing submissions, the hearings were declared closed on April 29, 2005, with a deadline of June 28, 2005, for the panel to render its award. The New York Arbitration Panel issued its award on June 27, 2005, denying all of Terrebonne's claims, but awarding him arbitration costs in the amount of $9,132 to be paid by K-Sea.[4]

On August 5, 2005, K-Sea moved to reopen this suit, and to enter judgment confirming the arbitration award and dismissing the lawsuit with prejudice (and to deposit the $9,132 awarded Terrebonne with the court), per 9 U.S.C. § 9.[5] Terrebonne on

---

[4]K-Sea then attempted to pay Terrebonne the $9,132, but his attorney informed K-Sea by a July 8, 2005 letter that Terrebonne would not accept the $9,132 as such would be inconsistent with the intention "to contest the viability of enforcement of the arbitration award."

[5]9 U.S.C. § 9, "Award of arbitrators; confirmation; jurisdiction; procedure," states, in pertinent part:
> "If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award,

6

August 12, 2005 filed an opposition to K-Sea's motion[6] and also moved to set aside the district court's September 2002 order. He argued that enforcing the arbitration award would violate public policy and that the agreement violated section five of the FELA. On December 15, 2005, the district court granted K-Sea's motion and denied Terrebonne's request to set aside the September 2002 order because the request "assert[ed] the same arguments that th[e] Court ha[d] taken to be borderline frivolous twice before." This last order further provides that "plaintiff's claims against the defendant are hereby dismissed, with prejudice."

Terrebonne timely appealed.

## DISCUSSION

The gist of Terrebonne's arguments on appeal is that the March 2001 arbitration agreement is unenforceable. He secondarily asserts that, if the agreement is enforceable, his "re-injury" falls outside the agreement's scope. Terrebonne does not contend that the arbitration panel erred. Rather, he attacks the district court's orders compelling arbitration and confirming the arbitration award; in effect, he argues that his claims should not

and thereupon the court must grant such an order unless the award is vacated, modified, or corrected . . . ."

[6]Terrebonne opposed K-Sea's motion to confirm the arbitration award and moved to set aside the September 2002 order under FRCP 60(b). The district court considered Terrebonne's motion under Rule 60(b)(4) through (6) because these were "the only bases for 60(b) relief when sought more than one year after the challenged order was entered."

7

have been subjected to arbitration in the first place. We disagree, and affirm the district court's orders, finding the arbitration agreement both enforceable and broad enough for the district court to compel arbitration and allow the arbitrators to determine the agreement's scope.

## I.  Jurisdiction and Standards of Review

This court has jurisdiction over the instant appeal by virtue of 28 U.S.C. § 1291[7] and 9 U.S.C. § 16.[8] The parties both assume

---

[7]28 U.S.C. § 1291 states that "[t]he courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States . . . ."

[8]Section 16 of the FAA, "Appeals," states:
"(a) An appeal may be taken from—
    (1) an order—
        (A) refusing a stay of any action under section 3 of this title,
        (B) denying a petition under section 4 of this title to order arbitration to proceed,
        (C) denying an application under section 206 of this title to compel arbitration,
        (D) confirming or denying confirmation of an award or partial award, or
        (E) modifying, correcting, or vacating an award;
    (2) an interlocutory order granting, continuing, or modifying an injunction against an arbitration that is subject to this title; or
    (3) a final decision with respect to an arbitration that is subject to this title.
(b) Except as otherwise provided in section 1292(b) of title 28, an appeal may not be taken from an interlocutory order—
    (1) granting a stay of any action under section 3 of this title;
    (2) directing arbitration to proceed under section 4 of this title;
    (3) compelling arbitration under section 206 of this title; or
    (4) refusing to enjoin an arbitration that is subject to this title.  9 U.S.C. § 16 (2000).

8

that the fact that this appeal is from the district court's December 15, 2005 order confirming the award and dismissing Terrebonne's suit with prejudice – rather than from the September 2002 order compelling arbitration, staying the action and stating "this case is closed for statistical purposes" – does not of itself preclude Terrebonne from challenging the validity of the September 2002 order.[9]  We accordingly proceed on that assumption.

---

[9]Any such preclusion would not of itself be truly jurisdictional, but would be more in the nature of law of the case, estoppel or res judicata.  We do note that where we dismissed for want of jurisdiction an attempted appeal from an order staying litigation pending arbitration because the order was non-final, we stated that it "was not the case" that the appellant then

> ". . . will be left with virtually no remedy, because of the deference afforded an arbitrator's award, if the district court has mistakenly forced it to arbitrate the issue of arbitrability.  If the district court confirms the arbitration award, this court will then have jurisdiction to conduct a 'typical' review of the district court's decision regarding the scope of the agreement to arbitrate." *F.C. Schaffer & Associates Inc. v. Demech Contractors Ltd.*, 101 F.3d 40, 43 (5th Cir. 1996).

*See also Jolley v. Paine Webber Jackson & Curtis Inc.*, 864 F.2d 402, 404 (5th Cir. 1989).  It may well be that the foregoing passage from *Schaffer* is inapplicable where the challenged order to arbitrate *was* final and appealable.  We also note, however, that the September 2002 order here appears to be interlocutory and not final and hence to be non-appealable under 9 U.S.C. § 16(b).  *Mire v. Full Spectrum Lending Inc.*, 389 F.3d 163 (5th Cir. 2004).  We note in this respect that the fact that the case was *not* dismissed, that a "stay" was granted and that the closing was stated to be "for statistical purposes" (see note 3 *supra*) all suggest non-finality.  *See South Louisiana Cement v. Van Aallst Bulk Handling*, 383 F.3d 297, 301-02 (5th Cir. 2004).  In *American Heritage Life Ins. Co. v. Orr*, 294 F.3d 702, 706-07 (5th Cir. 2002), the order held appealable, though it did not expressly dismiss the case, did not purport to stay proceedings in the court issuing the order (it stayed proceedings only in

We review *de novo* the district court's ruling on K-Sea's motion to compel arbitration and stay litigation. *Freudensprung v. Offshore Technical Services, Inc.*, 379 F.3d 327, 337 (5th Cir. 2004). The district court's denial of Terrebonne's motion for rehearing—treated as a Rule 60(b) motion—is reviewed for an abuse of discretion. *Warfield v. Byron*, 436 F.3d 551, 555 (5th Cir. 2006). Confirmation of the arbitrator's award is reviewed *de novo*. *Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314, 1320 (5th Cir. 1994).

II. Terrebonne's Arguments and Applicable Law

A. *Enforceability of the Arbitration Agreement*

Terrebonne focuses his appeal almost entirely on the district court's September 2002 order to arbitrate and the validity or enforceability of the March 2001 arbitration agreement. Specifically, he makes two challenges against the agreement: First, he asserts that the arbitration agreement is subsumed into his employment contract and therefore unenforceable per section one of the FAA, 9 U.S.C. § 1, which excludes "contracts of employment of seamen" from the FAA's purview. Second, Terrebonne contends that the agreement is void under section five of the FELA, which is

---

state court) and its statement that the case "is closed" was wholly unmodified by any language (such as "for statistical purposes" or "administratively") which might indicate the closure was not final and complete for all purposes.

10

applicable here by virtue of the Jones Act, 48 U.S.C. § 688.[10] Section Five of the FELA provides in relevant part that "[a]ny contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void."  45 U.S.C. § 55.  We consider each argument in turn below.

### 1.  Section One of the FAA

The FAA "compels judicial enforcement of a wide range of written arbitration agreements."  *Circuit City Stores, Inc. v. Adams*, 121 S.Ct. 1302, 1307 (2001).  Accordingly, the FAA "generally declares valid and enforceable written provisions for arbitration in any maritime transaction . . . ."  *Freudensprung*, 379 F.3d at 339.  This is consistent with the FAA's purpose, which

---

[10]46 U.S.C. § 688, the Jones Act, provides in relevant part: "Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located."  46 U.S.C. § 688(a).

11

"was to reverse the longstanding judicial hostility to arbitration agreements." *Gilmer v. Interstate/Johnson Lane Corp.*, 111 S.Ct. 1647, 1651 (1991).

Section one of the FAA, however, provides that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Terrebonne argues that this exclusion applies in the instant case because the March 2001 agreement is subsumed into his employment contract. We find this argument unpersuasive.

First, we note that the agreement here only partially settles claims for benefits and damages related to Terrebonne's November 2000 injury. It does not purport either to employ Terrebonne or to modify Terrebonne's contract of employment in any way. Thus, on its face, the agreement does not appear to fall within section one's exception for "contracts of employment of seamen."

Terrebonne, however, argues that the March 2001 agreement is subsumed into his employment contract because the agreement covers his maintenance and cure claims. Because maintenance and cure are inseparable from a seaman's employment, he contends, the agreement necessarily constitutes part of his employment contract, such that the agreement falls within section one's exception.[11]

---

[11]K-Sea argues that Terrebonne did not raise this issue below. Terrebonne replies that his Memorandum in Opposition to Motion to Compel Arbitration and Stay Litigation Pending

12

The March 2001 agreement indeed covered Terrebonne's maintenance and cure claims up to the time that the agreement was entered into. We reject, however, Terrebonne's assertion that these maintenance and cure claims necessarily implicate his employment contract. Certainly, there is case law using generalized language connecting maintenance and cure to the seaman's employment contract. *See, e.g.*, *Aguilar v. Standard Oil Co. of N.J.*, 63 S.Ct. 930, 933-34 (1943) ("In the United States [maintenance and cure] has been recognized consistently as an implied provision in contracts of marine employment."); *Tate v. Am. Tugs, Inc.*, 634 F.2d 869, 870 (5th Cir. 1981) ("The right of an injured seaman to maintenance is a form of compensation that arises out of the contract of employment."). Yet, we have clarified that maintenance and cure is an intrinsic part of the employment *relationship*, separate from the actual employment *contract*:

---

Arbitration, filed on September 3, 2002, raised the argument. Specifically, Terrebonne points to his statement in the memorandum that, "Just at [sic] the right to maintenance and cure is implied in a seaman's employment contract *Aguilar v Standard Oil Co. of N.J.*, 318 U.S. 724, 730 (1943), an arbitration agreement for a seaman's unaccrued personal injury claim is subsumed within the employment contract." Given that this appears to be the sole indication that Terrebonne raised his maintenance and cure argument below, it is doubtful that the argument was briefed adequately for the district court to consider it. *Compare Goetz v. Synthesys Tech.s, Inc.*, 415 F.3d 481, 485 n.13 (5th Cir. 2005) (stating that, even where an issue was "raised in a muddled fashion, the fact that the district court was able to rule on the issue is sufficient for us to consider it raised, even in a refined form on appeal"). In any event, the argument lacks merit for the reasons stated below.

13

> "[M]aintenance and cure differs from contractual rights. The Court, in *Cortes v. Baltimore Insular Line*, 287 U.S. 367, 371, 53 S.Ct. 173, 77 L.Ed. 368 (1932), held that maintenance and cure 'is imposed by the law itself as one annex to the employment. . . . Contractual it is [in the] sense that it has its source in a relation which is contractual in origin, but given the relation, no agreement is competent to abrogate the incident.'" *Wood v. Diamond M Drilling Co.*, 691 F.2d 1165, 1170 (5th Cir. 1982) (concluding that "recovery of maintenance and cure is not subject to the same mitigation limitations that govern recovery based on ordinary contractual rights").[12]

In other words, maintenance and cure is an essential part of the seaman's employment *relationship* that cannot be contracted away: "The duty to provide maintenance attaches once the seaman enters the service of the ship and it is 'a duty that no private agreement is competent to abrogate.'" *Baldassaro v. United States*, 64 F.3d 206, 212 (5th Cir. 1995) (quoting *De Zon v. Am. President Lines*, 63 S.Ct. 814, 818 (1943)). It is true that collective bargaining agreements may validly set the rate of maintenance and cure. *See id.* at 212 ("The right to maintenance cannot be abrogated, but it can be modified and defined by contract."). But we do not accept that this in turn means that maintenance and cure is part of the employment *contract*. Further, while the March 2001 agreement states that K-Sea is obligated to pay maintenance and cure, it does

---

[12]Since this court's decision in *Wood*, the Supreme Court has noted that the rule under *Cortes*, that "[u]nder traditional maritime law . . . there is no right of survival; a seaman's personal cause of action does not survive the seaman's death," has been changed "in many instances" by Congress and the States. *Miles v. Apex Marine Corp.*, 111 S.Ct. 317, 326 (1990). This does not affect the strength of our decision in *Wood* as it discusses maintenance and cure.

14

not purport to change anything regarding that obligation or regarding Terrebonne's employment with K-Sea. Thus, we conclude the agreement is not subsumed into Terrebonne's employment contract, and does not fall under section one's exception to the FAA's coverage.[13]

### 2. Section Five of the FELA

We also reject Terrebonne's assertion that because this is a Jones Act case, the arbitration agreement is invalid for the reason that it violates section five of the FELA. "In passing the Jones

_____

[13]*See also, e.g., Williams v. Cigna Financial Advisors Inc.*, 56 F.3d 656 (5th Cir. 1995), an employee's discrimination suit against his employer, Cigna, in which we rejected the contention that the arbitration agreement was excluded from the FAA as falling within the exemption for "contracts of employment of . . . workers engaged in . . . interstate commerce" under 9 U.S.C. § 1. As our opinion came well before *Circuit City Stores, Inc. v. Adams*, 121 S.Ct. 1302 (2001), we based our decision in that respect (as the Supreme Court had a few years previously in *Gilmer v. Interstate/Johnson Lane Corp.*, 111 S.Ct. 1647 (1991)) solely on the ground that the arbitration agreement was not a contract of employment for purposes of § 1 and did not address whether the "workers engaged in . . . interstate commerce" aspect of the above quoted § 1 exclusion was satisfied. The plaintiff's employment contract with Cigna, a member of the National Association of Securities Dealers (NASD), was known as a "Registered Representative Agreement" and the arbitration agreement (requiring arbitration of employment related disputes with the registrant's employer) was contained in a "U-4 Registration," an agreement required to be executed with NASD as a part of registering with it, which was required of the plaintiff by his Registered Representative Agreement. We held: ". . . if we were to hold that Williams' Registered Representative Agreement incorporated by reference the U-4 Registration arbitration clause, § 1 would still exempt only the contract of employment. The U-4 Registration is a separate contract, and its arbitration clause is enforceable under the FAA." *Id.*, 56 F.3d at 660.

15

Act, Congress did not specifically enumerate the rights of seamen, but extended to them the same rights granted to railway employees by FELA." *Withhart v. Otto Candies, L.L.C.*, 431 F.3d 840, 843 (5th Cir. 2005). Section five of the FELA invalidates "[a]ny contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter . . . ." 45 U.S.C. § 55 (2000).

For his FELA-based argument, Terrebonne relies heavily on *Boyd v. Grand Trunk W. R.R. Co.*, 70 S.Ct. 26 (1949) (per curiam). In *Boyd* the railroad employee, having been injured on the job, agreed, in exchange for his employer's cash advances against whatever settlement or recovery was later achieved, that any suit to be filed on account of the injury would be filed only in a district (or county) that was either his residence when injured or in which the injury occurred. Both such locations were in Michigan, but the employee filed suit in the Supreme Court of Cook County, Illinois. The railroad sued the employee in Michigan state court to enjoin his prosecution of the Illinois suit, and the Michigan Supreme Court ruled for the railroad. The United States Supreme Court reversed, holding that the Illinois suit was in a venue specifically authorized under section 6 of the FELA[14] and that hence

_____

[14]FELA's section six, "Actions; limitations; concurrent jurisdiction of courts," 45 U.S.C. § 56, provides, in relevant part:

16

FELA section 5 voided the agreement excluding that venue provided for in section 6.

For several reasons, we are not persuaded that *Boyd* controls here.

To begin with, the venue provisions of section 6 of the FELA – which *Boyd* held protected by FELA section 5 – do not apply to the Jones Act, which has its own venue provision contained in the last sentence of section 688(a) (see note 10, *supra*), and provides for venue in a district where "the defendant employer resides" or "his principal office is located."[15] Venue of a Jones Act case is hence *not* provided for in section 6, or in any other provision, of the FELA. We directly so held in *Pure Oil Co. v. Suarez*, 346 F.2d 890, 892 (5th Cir. 1965), *affirmed on other grounds*, 86 S.Ct. 1394 (1966). There, the plaintiff seaman brought a Jones Act and general maritime law suit against his employer, Pure Oil Company,

_____

"Under this chapter an action may be brought in a district court of the United States, in the district of the residence of the defendant, or in which the cause of action arose, or in which the defendant shall be doing business at the time of commencing such action."

[15]Although this sentence of § 688(a) is written in terms of "jurisdiction," it has been construed to refer only to venue. *Panama R. Co. v. Johnson*, 44 S.Ct. 391, 393 (1924).

28 U.S.C. § 1391(c) provides in part that "[f]or purposes of venue under this chapter, a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced." That section, as it was enacted in 1948, was held applicable to the Jones Act in *Pure Oil Company v. Suarez*, 86 S.Ct. 1391 (1966).

in the Southern District of Florida. The defendant moved to transfer the case to the Northern District of Illinois, it being undisputed that it was incorporated in Ohio and had its principal office in Illinois, although it did do substantial business in the Southern District of Florida when the suit was commenced. The district court denied the motion to transfer, but certified its ruling to this court under 28 U.S.C. § 1292(b). We noted that "[t]he relevant language of the Jones Act, 46 U.S.C. § 688" provides for venue in the district "in which the defendant employer resides" or has its principal office, and that "in the absence of a statutory directive to the contrary, the 'residence' of a corporation for venue purposes is limited to the state of its incorporation." *Id*. at 891-92. We stated that "appellee [seaman] makes two arguments in support of the district court's denial of the motion to transfer," describing the first of these as follows: ". . . appellee argues that the special venue provisions of the Federal Employers Liability Act, under which venue against Pure Oil would undoubtedly be proper in the instant case, are applicable to a civil action under the Jones Act." *Id*. at 892 (footnote omitted).[16] Characterizing this argument as one "which can be disposed of in short order," we emphatically rejected it, stating:

---

[16]Citing FELA § 6, we noted that "[t]he FELA contains much broader venue provisions than those of the Jones Act" and provides that venue is proper in, among other districts, any "where the defendant is 'doing business' at the time of the commencement of the action." *Id*., 892 n.3.

18

"However, this argument does not adequately accommodate the well-recognized and eminently logical canon of statutory construction that the specific provisions of a statute control exclusively over the broader and more general provisions of another statute which may relate to the same subject matter in the absence of a clear manifestation to the contrary by the legislature. . . . [citations omitted]. As one court has stated, 'The short answer to [appellee's] argument is that Congress has seen fit to impose different venue requirements in Jones Act cases. To now hold that the venue requirements under the Federal Employers' Liability Act are controlling would negate the plain language of 46 U.S.C. § 688.' *Rodriguez v. United Fruit Co.*, 236 F. Supp. 680, 682 (E.D. Va.

1964)." *Id*.

Having rejected the seaman-appellee's first argument, we proceeded to consider his second, characterized as "a far more appealing argument," which was that "the definition of the term 'residence' which was added to the general venue statute in 1948, 28 U.S.C.A. § 1391(c), should be read into the Jones Act." *Id*. at 893.[17] Under the terms of section 1391(c), as added in 1948, "any judicial district in which" a corporation "is incorporated or licensed to do business or is doing business . . . shall be regarded as the residence of such corporation for venue purposes." Agreeing with appellee's second argument, we held that this

---

[17]We observed that: "Prior to 1948 – and, indeed, at the time Congress enacted the Jones Act in 1920 – . . . The residence of a corporation [for venue purposes] was uniformly restricted to the state of its incorporation, even in Jones Act suits. *E.g., Burris v. Matson Nav. Co.*, (S.D.N.Y. 1940), 37 F. Supp. 648." *Id*. In the cited *Burris* case, Jones Act venue was held improper even though the defendant was, at the time of suit, doing business in the district.

19

definition of a corporate defendant's residence in section 1391(c) applied to determine the district "in which the" corporate "defendant employer resides" as provided in section 688, and on that basis affirmed the district court's denial of the motion to transfer. *Id*. at 893-97. In this latter connection we considered and rejected the contention that the Supreme Court's decision in *Fourco Glass Co. v. Transmirra Prods. Corp.*, 77 S.Ct. 787 (1957) (holding section 1391(c) did not define a corporate defendant's residence under 28 U.S.C. § 1400(b) applicable to patent infringement suits) dictated a contrary result. *Id*. at 894 *et seq*.

The Supreme Court granted certiorari to resolve the issue concerning section 1391(c), section 688 and the *Fourco* case, and ultimately affirmed this court, holding that the section 1391(c) definition of corporate residence applied to determine the district "in which" the corporate "defendant employer resides" as provided in § 688. *Pure Oil Co. v. Suarez*, 88 S.Ct. 1394 (1966). The Supreme Court did not mention our holding that the venue provisions of section 6 of the FELA did not apply to the Jones Act.[18] We note, however, that the section 1391(c) question would not have any practical importance if Jones Act venue included whatever venue

---

[18]Nor did the Supreme Court pass on our separate holding (346 F.2d at 891, n.1) that where a suit is based on both the Jones Act and unseaworthiness the venue requirements of the Jones Act must be satisfied, the Supreme Court stating there was "no occasion to pass upon this issue" as it "was not raised in this Court." 86 S.Ct. at 1395 n.2.

would be proper under section 6 of the FELA because section 1391(c) embraced no venue not authorized by section 6.

Because, under our decision in *Pure Oil Co.*, the venue provisions of section 6 of the FELA are inapplicable to Jones Act cases, it necessarily follows that nothing in section 5 of the FELA is applicable to Jones Act venue. Hence, neither *Boyd* nor section 5 dictate the result here.[19]

*Boyd* is also to be distinguished because it did not in any way involve the FAA (or, indeed, an agreement to arbitrate). There was no federal statute authorizing or providing for the enforcement of the type of agreement involved in *Boyd*. In *Gilmer v. Interstate/Johnson Lane Corp.*, 111 S.Ct. 1647 (1991), the Court upheld an agreement to arbitrate governed by the FAA, specifically distinguishing prior cases on the ground, *inter alia*, that "those cases were not decided under the FAA, which, as discussed above, reflects a 'liberal federal policy favoring arbitration

---

[19]Moreover, in *Boyd* the Court specifically distinguished its decision in *Ex parte Collect*, 69 .Ct. 944 (1949), where the Court upheld the 28 U.S.C. § 1404(a) transfer to a different district in a different state, at the defendant railroad's request and over the plaintiff-employee's objection, of the employee's FELA suit filed in a section 6 authorized district prior to the enactment of § 1404(a). *Collect* observes that § 1404(a) "does not limit or otherwise modify any right granted in [FELA] § 6 . . . to bring suit in a particular district . . . [a]n action may still be brought in any court . . . in which it might have been brought previously." *Id*. at 947. *Boyd*, which quotes this passage from *Collect*, explains that "nothing in *Ex parte Collect* . . . affects the *initial* choice of venue afforded Liability Act plaintiffs." *Boyd*, 70 S.Ct. at 28 (emphasis added).

21

agreements.'" *Id*. at 1657 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth Inc.,* 105 S.Ct. 3346, 3353 (1985)). *See also, e.g., Shearson/American Express Inc. v. McMahon*, 107 S.Ct. 2332, 2337 (1987) ("The Arbitration Act thus establishes a federal policy favoring arbitration") (inside quotation marks and citation omitted). Here, in contrast to *Boyd*, the FAA *is* involved and thus the issues "*must* be addressed with a healthy regard for the federal policy favoring arbitration." *Gilmer* at 1652 (emphasis added; inside quotation marks and citation omitted).[20]

Terrebonne answers this argument solely by relying on *Wilko v. Swan*, 74 S.Ct. 182 (1953). *Wilko* was a suit by a customer against a brokerage firm alleging the firm sold him certain securities by misrepresentations. The suit was pursuant to sections 12(2) and 22(a) of the Securities Act of 1933, 15 U.S.C. § 77l(2), 77v(a), which respectively provide that under certain circumstances the seller making such misrepresentation "shall be liable to the person purchasing such security from him, who may sue . . . in any court of competent jurisdiction, to recover the consideration paid . . .", and that the United States District Courts have jurisdiction

---

[20]*Boutte v. Cenac Towing Inc.*, 346 F. Supp. 2d 922 (S.D. Tx. 2004), relied on by appellant, is similarly distinguishable because the agreement there held invalid was not an arbitration agreement and even if it had been it would have been expressly exempted from the FAA by the terms of 9 U.S.C. § 1 as it was contained in the seaman's employment agreement. *Boutte* at 932 ("choice of forum agreements in employment contracts between American seaman and American companies are unenforceable in Jones Act claims").

22

over such suits, with venue in a district where, *inter alia*, the defendant is "found" or "transacts business" or where "the sale took place" but precluding removal of state court suits. The defendant moved under section 3 of the FAA to stay trial of the suit pending completion of arbitration, relying on the arbitration provisions of the plaintiff's margin agreement with the brokerage firm (executed prior to the challenged sale). The Supreme Court noted that section 14 of the Securities Act, 15 U.S.C. § 77(a), provided that "[a]ny condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter . . . shall be void." *Id*. at 184 n.6. It went on to hold that the arbitration agreement was invalid because

> "The words of § 14, . . . void any 'stipulation' waiving compliance with any 'provision' of the Securities Act. This arrangement to arbitrate is a 'stipulation,' and we think the right to select the judicial forum is the kind of 'provision' that cannot be waived under § 14 of the Securities Act."

*Id*. at 186, and that "Congress must have intended § 14 . . . to apply to waiver of judicial trial and review." *Id*. at 188.

The *Wilko* Court then continued by stating:

> "This accords with Boyd v. Grand Trunk Western R. Co., . . . . We there held invalid a stipulation restricting an employee's choice of venue in an action under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. Section 6 of that Act permitted suit in any one of several localities and § 5 forbade a common carrier's exempting itself from any liability under the Act. Section 5 had been adopted to avoid contracts waiving employers' liability. . . . We said the right to select

23

the 'forum' . . . is a 'substantial right' and that the agreement, restricting that choice, would thwart the express purpose of the statute." *Id*. (footnotes omitted).

However, over a decade ago the Supreme Court, in *Rodriguez De Quijas v. Shearson/American Express Inc.*, 109 S.Ct. 1917 (1989), expressly overruled *Wilko*, and held that a predispute agreement to arbitrate was validly applicable to a claim under section 12(2) of the Securities Act and was not invalided by section 14 thereof.[21] *Rodriguez* observed that *Wilko's* "characterization of the arbitration process" was "pervaded by . . . 'the old judicial hostility to arbitration'" which had become "outmoded" and had "fallen far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes." *Id*. at 1920. It rejected the *Wilko*'s holding "that § 14 did not permit waiver of 'the right to select the judicial forum'", *id*. at 1919, on the ground that "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.'" *Id*. at 1920 (internal quotation marks and citation omitted). It likewise held, with reference to the procedural litigation provisions contained in the Securities Act,

_____

[21]Appellant's counsel neglected to note in any of his pre-oral argument briefing that *Wilko* had been overruled, and only after oral argument, at which the matter was called to his attention, did he, with our permission, file a post-submission brief recognizing that fact.

24

such as "the statute's broad venue provisions," "nationwide service of process" and "concurrent jurisdiction in the state and federal courts without possibility of removal," that: "There is no sound basis for construing the prohibition in § 14 on waiving 'compliance with any provision' of the Securities Act to apply to these procedural provisions." *Id*. These holdings are similarly applicable here. Under the arbitration agreement, Terrebonne "does not forgo the substantive rights afforded by" the Jones Act (and the general maritime law), he "only submits to their resolution in an arbitral, rather than a judicial, forum."

Terrebonne argues in his post-submission brief (see note 21 *supra*) that *Rodriguez* is restricted to "business transactions." That argument, however, is clearly refuted by *Gilmer*, which relied on, *inter alia*, *Rodriguez*, to enforce under the FAA a pre-dispute arbitration agreement as applied to an individual employee's claim under the Age Discrimination in Employment Act. *See Gilmer*, 111 S.Ct. at 1652, 1654, 1655.[22]

In this connection, Terrebonne further passingly contends, in

---

[22]*See also, e.g., Circuit City Stores, Inc. v. Adams*, 121 S.Ct. 1302, 1313 (2001), ("The Court has been quite specific in holding that arbitration agreements can be enforced under the FAA without contravening the policies of congressional enactments giving employees specific protection against discrimination prohibited by federal law. . ."); *Garrett v. Circuit City Stores, Inc.*, 449 F.3d 672 (5th Cir. 2006) (Uniformed Services Employment and Reemployment Rights Act); *Carter v. Countrywide Credit Industries, Inc.*, 362 F.3d 294 (5th Cir. 2004) (Fair Labor Standards Act); *Alford v. Dean Witter Reynolds, Inc.*, 939 F.2d 229 (5th Cir. 1991) (Title VII).

a most conclusory fashion, that requiring arbitration of a seaman's Jones Act claim is contrary to public policy.  But, as noted above, the FAA "establishes a federal policy favoring arbitration." *McMahon* at 2337.  The burden is on Terrebonne to show a contrary and compelling public interest.  *Gilmer* at 1652.  Terrebonne has made no such showing.  "Having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue."  *Gilmer* at 1652 (citation and inside quotation marks omitted).[23]  The only such indication on the part of Congress is the concluding clause of section 1 of the FAA which expressly exempts from the FAA, and from the binding effect it gives to pre-dispute contracts to arbitrate, "contracts of employment of seamen, railroad employees," or other such in-commerce transportation workers.  Beyond that express exemption, there is certainly no more public policy reason to exempt seamen from the binding effect of pre-dispute contracts – *other than* contracts of employment – to arbitrate Jones Act or general maritime law claims against their employer than there is to exempt

---

[23]In *Gilmer* the Court held ADEA claims subject to a pre-dispute agreement to arbitrate notwithstanding "the recent amendments to the ADEA."  *Id*. at 1653-54.  We note that "the recent amendments" referred to are apparently those of Pub. L. 101-433, Title II, § 201, October 16, 1990, 104 Stat. 983, codified at 29 U.S.C. § 626(f)(1), which provide in part that "the individual does not waive rights or claims that may arise after the date the waiver is executed." § 626(f)(1)(C).

26

employees protected by the various civil rights or employee protection statutes from the binding effect of pre-dispute contracts to arbitrate claims under such statutes against their employer. *See Gilmer* and note 22 *supra*.

This comports with our decision in *Freudensprung v. Offshore Technical Services, Inc.*, 379 F.3d 327 (5th Cir. 2004), where we affirmed the district court's orders staying litigation of the plaintiff's Jones Act claim pending arbitration. *Id*. at 332. We noted that "the Convention on the Recognition and Enforcement of Foreign Arbitral Awards," 9 U.S.C. §§ 201-208, "governs concurrently with the FAA in this case." *Id*. at 338. We held that "even assuming *arguendo* that the Consultant's Agreement [by which the defendant retained the plaintiff] is a seaman's employment contract, the arbitration agreement contained therein is nonetheless enforceable pursuant to the Convention . . . ." *Id*. We rejected the plaintiff's argument

> ". . . that a 'pre-injury' agreement to arbitrate rather
> than litigate his personal injury claims is 'inherently
> unfair' because he could not have made an informed
> decision concerning his post-injury remedies before his
> injury had occurred and before any medical advice was
> available to him. The difficulty with this argument is
> that the same could be said of any advance agreement to
> arbitrate personal injury claims, and it is by now beyond
> cavil that such agreements are presumptively enforceable.
> As noted above, Freudensprung and OTSI agreed to
> arbitrate 'any dispute' arising out of the Consultant's
> Agreement. It is '[o]nly by rigorously enforcing
> arbitration agreements according to their terms, do we
> "give effect to the contractual rights and expectations
> of the parties, without doing violence to the policies
> behind the FAA."' *Ford v. NYLCare Health Plans of Gulf*

27

> *Coast, Inc.*, 141 F.3d 243, 248-49 (5th Cir. 1998)
> (quoting *Volt Information Sci., Inc. v. Bd. of Trustees
> of Leland Stanford Junior Univ*., 489 U.S. 468, 479, 109
> S.Ct. 1248, 103 L.Ed.2d 488 (1989)." *Id*. at 342.

The plain implication is that *if* the agreement was *not* contained in a seaman's contract of employment it would be enforceable under the FAA.

We observe that, beyond vague references to the unfairness of pre-injury arbitration agreements (of seamen and of others) *generally* and *generically*, Terrebonne has never asserted in this case (or urged on this appeal) that the March 12, 2001 agreement here was invalid because *it* was not (or was not shown to be) sufficiently voluntary, informed and understood on his part, or because the amount paid for damages incurred up until March 12, 2001 was not (or was not shown to be) fair and adequate, or because the agreement was not otherwise sufficiently fair or shown to be so. Terrebonne's public policy arguments lack merit.

B*. Scope of the Arbitration Agreement*

In addition to challenging the arbitration agreement's enforceability, Terrebonne asserts that if the agreement is enforceable, his "re-injury" is separate from his prior hernia and thus outside the agreement's coverage. We hold that the district court did not err in compelling arbitration or confirming the arbitration award on this basis; the agreement was sufficiently broad for the district court to compel arbitration and allow the arbitration panel to determine its scope.

28

The agreement clearly states that it encompasses "any claims related" to Terrebonne's November 2000 injury. Terrebonne's complaint in this action is for damages for *both* his 2000 accident and his April 2001 "re-injury." Terrebonne has nowhere asserted that he is only or even mainly asking for damages for his reinjury. Further, Terrebonne has not explained anywhere how these two are different. Thus, in light of Terrebonne's complaint—which lumps together the November 2000 and April 2001 injuries—the arbitration agreement was broad enough to be submitted to the arbitrators for determination of whether Terrebonne's reinjury fell within the agreement's scope. *See in re Complaint of Hornbeck Offshore (1984) Corp.*, 981 F.2d 752, 754–55 (5th Cir. 1993) (stating that this court distinguishes between broad and narrow arbitration clauses, and explaining, "If the clause is broad, the action should be stayed and the arbitrators permitted to decide whether the dispute falls within the clause"). We conclude that the arbitration clause is broad. *See, e.g., Hornbeck Offshore* at 755 ("any dispute" is broad) and *Beiser v. Weyler*, 284 F.3d 665, 669-70 (5th Cir. 2002) ("relates to" has a "plainly broad meaning"). Terrebonne has not attacked the award rendered by the arbitration panel; nor has he attacked the arbitrators' decision that the reinjury fell within the agreement's scope.

**CONCLUSION**

Terrebonne has shown no valid basis on which to reverse the

29

district court's decision to compel arbitration. The district court's judgment is accordingly

AFFIRMED.